**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raghav Mohindra,<br><br>           Plaintiff,<br><br>v.<br><br>Haresh Boghara, et al.,<br><br>           Defendants. | No. CV-25-02050-PHX-SHD<br><br>**ORDER** |

Pending before the Court are Plaintiff Raghav Mohindra's Motion for Temporary Restraining Order ("TRO") with Notice and Preliminary Injunction, and Epic Medical Services AZ LLC's ("Epic AZ") Motion to Intervene. (Docs. 8, 16.) Dr. Mohindra claims that Defendant Haresh Boghara fraudulently transferred funds from Epic AZ, over which Dr. Boghara has control, to himself and Defendant Christopher Kelly to avoid paying an arbitration award Dr. Mohindra obtained against Epic AZ (the "Award"). Because Dr. Mohindra has, at this early stage of the case, raised serious questions as to whether Dr. Boghara intends to or already has fraudulently transferred funds from Epic AZ to avoid payment on the Award, the Court grants Dr. Boghara temporary relief in the form of a 21-day TRO to maintain the status quo while the Court awaits further briefing from the parties and holds a hearing to determine whether a preliminary injunction is appropriate. The Court also orders expedited briefing on Epic AZ's Motion to Intervene. The Court will hold a hearing on both motions on **July 17, 2025**, and invites briefing on the need for expedited discovery in advance of the hearing.

## I.  BACKGROUND[1]

Dr. Mohindra formed a medical practice, More MD, in 2011. (Doc. 1 ¶ 14.) In 2021, Dr. Boghara offered to purchase a portion of Dr. Mohindra's interest in More MD. (*Id.* ¶ 17.) Dr. Boghara then formed Epic AZ to purchase More MD's assets. (*Id.* ¶ 19.) He was and is the sole member of Epic AZ. (Doc. 8 at 4.) In December 2021, Dr. Mohindra entered into a Membership Interest Purchase Agreement ("MIPA") with Epic AZ, under which "Epic AZ agreed to purchase all of [Dr. Mohindra's] membership interests in More MD for $10 million." (Doc. 1 ¶¶ 24–25.) As part of the payment plan, Epic AZ was required to pay an "EBITDA Earn-Out"—a specific amount calculated using More MD's yearly EBITDA—in 2023 and 2024. (*Id.* ¶¶ 25–26.)

In spring 2023, "a dispute arose between [Dr. Mohindra], on the one hand, and [Dr. Boghara], Epic AZ, and several other entities owned and operated by Dr. Boghara, on the other hand, relating to the EBITDA Earn-Out payment owed to [Dr. Mohindra] under the MIPA." (Doc. 8 at 5.) Dr. Mohindra instituted arbitration proceedings to resolve this dispute in August 2023. (Doc. 1 ¶ 32.) In May 2025, the arbitration panel ultimately issued a final arbitration award in Dr. Mohindra's favor, including approximately $6 million for the EBITDA Earn-Out under the MIPA. (Doc. 8 at 6.) "As of June 19, 2025, the total amount due" to Dr. Mohindra under the final arbitration award is $6,816,354.39. (*Id.* at 8.)

While the arbitration proceedings were ongoing, in March 2025, Dr. Mohindra learned Dr. Boghara had sold Epic AZ to Optima Medical ("Optima") for $7 million (the "Optima Sales Proceeds" or "Proceeds")—Optima, however, did not assume Epic AZ's liabilities. (*Id.* at 6–7.) Dr. Mohindra requested emergency relief from the arbitration panel "to ensure that [Dr. Boghara] did not dissipate the funds from the sale." (*Id.* at 7.) Dr. Boghara's counsel represented to the arbitration panel that Dr. Boghara was not taking any actions to avoid paying what he owed to Dr. Mohindra and he had "no intent to avoid

---

[1] These facts are supported by declarations and exhibits attached to Plaintiff's Complaint and Motion, (*see* Docs. 1-1, 1-2, 1-3, 1-4; Docs. 8-1, 8-2), as well as documents filed by Defendant, (*see* Doc. 15-1).

payment of a just award." (*Id.* (emphasis omitted).)  Dr. Boghara's counsel offered to place $856,435 in escrow, which was an undisputed portion of the EBITDA Earn-Out award, and the arbitration panel encouraged Dr. Boghara to do so.  (Doc. 8-2 at 79.)  The panel, however, declined to provide additional relief.  (*Id.*)

On May 16, 2025, Epic AZ's bankruptcy counsel sent correspondence to Dr. Mohindra's counsel confirming that Epic AZ sold its assets to Optima for $7 million.  (*Id.* at 94.)  Bankruptcy counsel stated that, "[w]ithout any material assets left from the sale, [Epic AZ] obviously [could not] satisfy the Award in full in addition to its various other liabilities."  (*Id.*)  To explain what had happened to the Optima Sales Proceeds, counsel stated that Epic AZ "only has $97,879 in funds under its direct control.  In addition, Mike Novotny has escrowed $856,435 of funds on behalf of Epic.  *The remaining funds have been distributed to Dr. Haresh Boghara and Christopher Kelly*."  (*Id.* (emphasis added).)  Specifically, Epic AZ transferred $280,000 to Kelly (Dr. Boghara's former counsel), "which [Kelly] assert[ed] represents fair compensation for services provided to Epic," (*id.*), and distributed the remaining funds (approximately $6.72 million) to Dr. Boghara.  (*Id.*; Doc. 8 at 8.)  Shortly after sending this letter, Dr. Boghara paid Dr. Mohindra the $856,435 that had been escrowed.  (Doc. 8-1 at 6 ¶ 32.)

On June 11, 2025, Dr. Mohindra filed this suit, alleging fraudulent transfer of the Proceeds based on the information provided by Epic Az's bankruptcy counsel.  (Doc. 1.)  On June 13, 2025, Dr. Mohindra's counsel contacted Dr. Boghara's counsel and Kelly to request they place the Optimal Sales Proceeds in escrow while the parties litigated this action.  (Doc. 8 at 8.)  "[Dr. Boghara's] counsel declined," and "Kelly did not respond at all."  (*Id.*)  Dr. Mohindra then moved for a TRO and preliminary injunction (the "Motion") on June 19, 2025.  (*Id.* at 1.)  On the Court's order, Dr. Mohindra served Dr. Boghara and Kelly with a copy of the Motion on June 20, 2025.  (Doc. 12 at 2; *see also* Doc. 11 at 2 n.1.)  The following business day, Dr. Boghara filed an initial response opposing the Motion asserting, among other things, that the Proceeds had never been transferred and instead were sequestered in an Epic AZ account.  (Doc. 11 at 3 (asserting that "no transfer

has occurred, let alone a fraudulent one").)

The Court held a hearing on June 24, 2025, to allow both parties to present their initial positions.[2] (Doc. 13.) After the hearing, the Court ordered Dr. Boghara to file a bank account statement "identifying (1) the financial institution where the Optima Sales Proceeds are currently being held, (2) the owner of the account, (3) the amount of the Optima Sales Proceeds in the account, and (4) all transactions involving the Optima Sales Proceeds for the last thirty (30) days." (Doc. 14.) Dr. Boghara filed a notice along with two exhibits. (Doc. 15.) Exhibit 1 is a statement from Bank of America providing information about an account owned by "Aavema Partners LP" from May 1 through May 31, 2025, showing an ending total market value of $5,807,303.21. (Doc. 15-1 at 2–11.) Dr. Boghara is listed as the contact for the account, which appears to have been opened on April 21, 2025, with funds deposited on April 22, 2025. (*Id.*) Exhibit 2 is a letter from PlainsCapital Bank stating that Epic AZ has accounts with it and confirming that these accounts have a total balance of $5,863,565 spread across "Business Basics Checking," "Business Money Market," and "Business CD" accounts as of June 24, 2025, representing the remaining net proceeds from the Optima sale.[3] (*Id.* at 13; Doc. 16 at 4 ¶ 7.)

## II.   LEGAL STANDARD

A plaintiff seeking a TRO must establish that (1) he is "likely to succeed on the merits"; (2) he is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [his] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (holding that, in the Ninth Circuit, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met" (citation modified)).

---

[2] Kelly received notice of the hearing, (Doc. 12 at 2; Doc. 12-1), but did not appear, (Doc. 13).

[3] In Dr. Boghara's declaration attached to Epic AZ's Motion to Intervene, he explained that PlainsCapital Bank "could not provide an account statement in sufficient time to meet the Court's deadline" and thus supplied the letter. (Doc. 16 at 4 ¶ 7.)

**III.   DISCUSSION**

The Court is satisfied that, at this stage, Dr. Mohindra has shown a likelihood of success and—at the very least—has shown serious questions going to the merits of his fraudulent transfer claims sufficient to warrant the granting of a TRO to preserve the status quo while the Court obtains more extensive briefing from the parties.[4]

Under the Arizona Uniform Fraudulent Transfer Act, a transfer is fraudulent as to a present or future creditor if the debtor effected the transfer with "actual intent to hinder, delay or defraud any creditor of the debtor" or "[w]ithout receiving a reasonably equivalent value in exchange for the transfer obligation," and the debtor either "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  Ariz. Rev. Stat. § 44-1004.

Dr. Mohindra alleges that Dr. Boghara transferred the Optimal Sales Proceeds "to himself with actual intent to hinder, delay, or defraud [Dr. Mohindra] and his ability to collect upon any arbitration award." (Doc. 8 at 10.) Dr. Mohindra argues that despite Dr. Boghara admitting Dr. Mohindra was entitled to at least $856,435 in damages—making him the "prevailing party" and entitling him to recover attorneys' fees, costs, and expenses in the arbitration—Dr. Boghara then sold Epic AZ's assets to Optima and transferred the Proceeds to himself and Kelly. (*Id.*)  Dr. Mohindra asserts that while Dr. Boghara took this action before the panel issued the Award, he did this after he was aware an arbitration award would be entered in Dr. Mohindra's favor. (*Id.* at 11.)  Dr. Mohindra also contends Dr. Boghara took "deliberate and fraudulent actions to conceal Epic AZ's financial condition and his intention to dispose of Epic AZ's assets," by, for example, falsely testifying that he did not contemplate selling Epic AZ and by representing to the panel that there was no concern he would take the sale proceeds and had no intention of avoiding

---

[4] Because Dr. Mohindra has established a likelihood of success on the merits of his fraudulent transfer claims in Counts I and II, the Court does not address his likelihood of success on Counts III and VI.

- 5 -

payment "of a just reward." (*Id.*) Next, Dr. Mohindra argues that neither Dr. Boghara nor Kelly "provided value to Epic AZ in exchange for the transfers," meaning Dr. Boghara made the transfer without receiving a reasonably equivalent value in exchange for the transfer obligation. (*Id.*) Dr. Mohindra asserts that Dr. Boghara is collaterally estopped from arguing he provided services to Epic AZ by the arbitration panel's findings, and Kelly was already separately compensated for the services he provided to Epic AZ. (*Id.* at 11–12). Last, Dr. Mohindra contends that "Epic AZ was left with unreasonably small remaining assets or insufficient assets" after the transfer, leading to Dr. Boghara's (and later, bankruptcy's counsel's) claim that "Epic AZ could not satisfy its debts." (*Id.* at 13.)

Dr. Boghara counters by arguing that his counsel informed Dr. Mohindra's counsel that the Optima Sales Proceeds are sequestered and are "clearly identifiable as proceeds of Epic AZ's assets—*i.e.*, no transfer has occurred, let alone a fraudulent one." (Doc. 11 at 3.) He asserts that the letter from his bankruptcy counsel merely states that Dr. Boghara has a claim to Epic AZ's assets, states that the Proceeds "remain available to pay all creditors," and explains how the funds would be distributed in the event of Epic AZ's potential bankruptcy. (*Id.* at 7.)

The Court does not credit Dr. Boghara's arguments. Dr. Boghara's bankruptcy counsel's letter directly contradicts Dr. Boghara's response here. (*See* Doc. 8-2 at 94.) Bankruptcy counsel expressly stated that the Optima Sales Proceeds had been distributed to Dr. Boghara and Kelly. (*Id.*) Dr. Boghara's opposition does not explain this statement. (*See* Doc. 11.) Further, the bank account information filed by Dr. Boghara indicates the Optima Sales Proceeds were held in a Bank of America account controlled by him and held by an entity other than Epic AZ beginning as early as April 22, 2025, (Doc. 15-1 at 2–11), and were moved to Epic AZ's PlainsCapital Bank accounts at some point between May 31 and June 24, (*id.* at 13). Dr. Mohindra's arguments and the evidence at this early stage establish a likelihood of success and raise—at the very least—a serious question going to the merits of whether Dr. Boghara committed or intends to commit a fraudulent transfer.

The Court also concludes Dr. Mohindra has shown a likelihood of irreparable harm

absent the issuance of a temporary restraining order. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Dr. Mohindra does not seek a complete asset freeze in this instance, but instead just a freeze of the remaining Optima Sales Proceeds. (*See* Doc. 8 at 2.) Dr. Mohindra alleges he will likely be unable to recover the arbitration award absent relief because, in relevant part, (1) "Dr. Boghara improperly transferred [the Proceeds] to himself and Kelly, and then directed Epic AZ to evaluate filing bankruptcy because it now ha[d] insufficient assets to satisfy its debts" to avoid paying the Award; and (2) after representing to the panel that he had no intention of avoiding payment, he transferred the Proceeds to himself and Kelly. (*Id.* at 16.) The letter from Dr. Boghara's bankruptcy counsel, the Bank of America statement, and the letter from PlainsCapital Bank further evidence the likelihood of irreparable harm, given the apparent placement of funds in an account held by an entity other than Epic AZ that is controlled by Dr. Boghara during May 2025. (*See* Doc. 8-2 at 94; Doc. 15-1.)

       Further, the Court finds that at this early stage, the balance of hardships favors Dr. Mohindra. *See Winter*, 555 U.S at 22. Dr. Mohindra alleges that in the absence of relief, he "will suffer immediate and irreparable injury" through the "continued dissipation and secreting of [the Proceeds] for the purpose of avoiding" Dr. Mohindra's claims, such that Dr. Mohindra could ultimately be unable to recover on the Award. (Doc. 8 at 17–18.) Dr. Mohindra's concerns are not unfounded, given the apparent partial dissipation of the Proceeds from $7 million to less than $5.9 million, which exceeds the $856,435 paid to Dr. Mohindra. On the other hand, Dr. Boghara will not suffer significant harm because he asserts the Proceeds "are sequestered in an Epic AZ account, are separately identifiable, and will not be used for anything other than payment of Epic AZ's bona fide debts and business expenses." (Doc. 11 at 3.) And as discussed below, these Proceeds belong to Epic AZ and it is unclear whether Dr. Boghara could dispose of them, given Epic AZ's potential bankruptcy proceedings. (*See* Doc. 8-2 at 94.)

Last, the Court finds that public policy weighs in favor of granting a TRO. The purpose of a TRO is to maintain the status quo until a more considered decision can be made. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *see also R.F. by Frankel v. Delano Union Sch. Dist.*, 224 F. Supp. 3d 979, 990 (E.D. Cal. 2016) (applying this holding to a TRO with notice). A TRO will accomplish that purpose until the Court receives further briefing and holds a hearing on whether a preliminary injunction is warranted.

Turning to the bond requirement, under Rule 65(c), the Court should issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The district court is afforded wide discretion in setting the amount of the bond . . . ." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Courts calculate the proper bond amount in different ways depending on the interest at stake. *See, e.g.*, *Goldwater Bank, N.A. v. Elizarov*, 2021 WL 3265012, at *4 n.32 (C.D. Cal. 2021) (holding the bond amount "roughly approximate[d] the time value of the money at stake during the pendency of the TRO based upon an interest rate of 10% per annum"). The Court may, however, "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson*, 572 F.3d at 1086 (citation omitted); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, when requiring security would effectively deny access to judicial review." (citation omitted)). Ultimately, "the court must consider what damages [the defendant] will suffer if the [TRO] is improperly granted." *Delex, LLC v. Delivery Express, Inc.*, 2002 WL 31466586, at *8 (D. Or. 2002). But the Court must also consider whether requiring a bond would "risk denying [the plaintiff] access to judicial review since the [TRO] would not take effect until [the plaintiff] posted the bond." *GoTo.com v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000).

As it pertains to the Court's grant of the TRO, the Court finds that Dr. Mohindra should not be required to post a significant bond at this time. As Dr. Boghara's filings indicate, the Proceeds are currently held in one or more bank accounts and presumably are accruing interest. (*See* Doc. 15-1 at 13.) That the disputed funds can earn interest for the short duration of the TRO lessens the need for a bond. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (holding court did not abuse discretion in not requiring a bond where, at "all times, [the] money [was] held in an interest-bearing account" and there was not a "showing that some harm [was] more likely absent the posting of a security bond").

That said, the Court finds that no bond at all, as Dr. Mohindra requests, would be inappropriate. Dr. Boghara states that he will be damaged "if he is wrongfully enjoined by an all asset freeze on his personal assets." (Doc. 11 at 10.) Although the Proceeds are not his personal assets, (*see* Doc. 11 at 3 ("[T]he funds in question . . . have been sequestered and are clearly identifiable as proceeds of Epic AZ's assets . . . ."); Doc. 8-2 at 94), Dr. Boghara may potentially have a claim against some of the Proceeds to pay his salary that he asserts has been unpaid for one year, (Doc. 11 at 3; Doc. 8-2 at 95). Accordingly, a bond is appropriate to account for Dr. Boghara's possible damages in losing the ability to receive his salary from the Proceeds for the short duration of the TRO, to the extent he is entitled to a salary. *See Delex*, 2002 WL 31466586, at *8. This essentially amounts to damages for loss of use, which is not as significant of a harm as loss of the Proceeds. *Cf. J.G. Boswell Co. v. C.I.R.*, 302 F.2d 682, 686 (9th Cir. 1962) ("[A] short term interruption in the use of the property is not . . . tantamount to a loss of the property itself."). Because it is unclear whether Dr. Boghara is entitled to a portion of the Proceeds to pay his salary, this further weighs in favor of not requiring Dr. Mohindra to post a significant bond at this time. (*See* Doc. 8 at 11–12 (arguing that Dr. Boghara is "collaterally estopped from asserting that he provided services to Epic AZ in exchange for the transfer" of the Proceeds).)

The Court also takes into account, however, that it is unclear at this time whether

the Proceeds are indeed Dr. Boghara's to disburse to himself, such that he could reasonably claim to be harmed by loss of use. (*See* Doc. 8-2 at 94 (noting that law firm had been retained to "address [Epic AZ's] insolvency" and that Epic AZ would "need to reach a reasonable resolution" or "initiate a Chapter 7 proceeding under the Bankruptcy Code to resolve the competing liabilities").) *Cf. Purity Bakery Bldg. Ltd. P'ship v. Penn-Star Ins. Co.*, 2011 WL 1324973, at *4 (D. Minn. 2011) (the non-movant was "obviously not harmed by being blocked from immediately collecting a judgment to which it had no legal entitlement"). Further, Dr. Mohindra asserts that the "likely prohibitive cost of a bond would prevent [him] from obtaining the provisional remedies to which he is entitled." (Doc. 8 at 17 n.4.) The Court determines that it will reduce the required bond accordingly. *GoTo*, 202 F.3d at 1211; *see also People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) ("The court has discretion to . . . request mere nominal security, where requiring security would effectively deny access to judicial review."), *as amended by* 775 F.2d 998 (9th Cir. 1985).

The Court will require Dr. Mohindra to post a $10,000 bond, which the Court deems, on balance, sufficient to compensate Dr. Boghara for any wrongful imposition of this TRO and also accounts for the short duration of the TRO, the uncertainty concerning Dr. Boghara's entitlement to receive a portion of the Proceeds to pay his salary in the near term, and Dr. Mohindra's ability to pay. *Cf. Purity Bakery*, 2011 WL 1324973, at *5 (requiring bond of $5,000 for TRO as "more than adequate to compensate [the plaintiff] for its loss of use of [a] judgment during the week or two that the Court [would] need to decide whether to grant [the defendant's] motion" to vacate a default judgment of $806,917.80, noting that the "only harm suffered" would be a "few days' delay in collecting on the judgment," which was a "harm that is trivial and fully compensable with money").

Accordingly,

**IT IS ORDERED** granting Plaintiff's motion for a TRO to preserve the status quo pending further briefing, and setting an expedited hearing on Plaintiffs' Motion for

Preliminary Injunction (Doc. 8) for **Thursday, July 17, 2025, at 10:00 a.m**. Defendants shall file a supplemental response to Plaintiff's Motion (Doc. 8) no later than **Monday, July 7, 2025**, and Plaintiff shall file his reply no later than **Monday, July 14, 2025**.

**IT IS FURTHER ORDERED** that Dr. Boghara and Kelly are enjoined for 21 days from directly or indirectly transferring, withdrawing, or otherwise disposing of the Proceeds they received from the sale of Epic AZ. The Proceeds must remain at in their current accounts at the institutions where they are currently held. Within seven days of the issuance of this order, Dr. Boghara and Kelly must (a) provide written notice of this order to the institutions where the Proceeds are currently held, so that they are bound by this order under Rule 65(d)(2); and (b) file proof of such written notice on the docket.

**IT IS FURTHER ORDERED** that, pursuant to Rule 65(c), this TRO becomes effective when Plaintiff posts a $10,000 bond as security.

**IT IS FURTHER ORDERED** that Plaintiff shall file a response to Defendants' Motion to Intervene no later than **Monday, July 7, 2025**, and Defendants shall file their reply by no later than **Monday, July 14, 2025**.

**IT IS FURTHER ORDERED** that any party seeking discovery shall file a motion for limited expedited discovery by no later than **Thursday, July 3, 2025**, and that any opposing party shall file their response by no later than **Monday, July 7, 2025**. The Court will decide this motion on an expedited basis to allow time for discovery before the hearing.

Dated this 26th day of June, 2025.

Honorable Sharad H. Desai
United States District Judge